## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

        Debtor.

Case No. **09-60452-7**

---

**RICHARD SAMSON**,

        Plaintiff.

-vs-

**TIMOTHY L. BLIXSETH**, **Desert Ranch LLLP**, **DESERT RANCH MANAGEMENT LLC**, and **DOES 1-5**,

        Defendants.

Adv No. **10-00088**

## *MEMORANDUM of DECISION*

At Butte in said District this 1st day of August, 2011.

In this Adversary Proceeding, after due notice, the Court held a hearing on February 14, 2011, in Butte on Defendant Timothy Blixseth's Motion for Mandatory Abstention or Permissive Abstention, filed November 11, 2010 at docket entry no. 9, and on Defendant Timothy Blixseth's Motion to Dismiss Adversary Complaint Pursuant to Fed.R.Bankr.P. 7012(b), filed November 12, 2010 at docket entry no. 12. Defendant Timothy Blixseth ("Blixseth") was represented at the

1

hearing by Patrick T. Fox of Helena, Montana; Plaintiff Richard Samson, the Chapter 7[1] Trustee ("Trustee") in the associated bankruptcy of Edra Blixseth ("Edra"), was represented at the hearing by Hugh McCullough of Seattle, Washington.  The Court heard oral argument from counsel.  None of the parties presented any witness testimony or offered any exhibits into evidence.  The Court held these contested matters in abeyance for a period of time given the involuntary bankruptcy case filed against Blixseth in Nevada, which has now been dismissed.

BACKGROUND

Defendant Timothy Blixseth and Debtor Edra Blixseth married on May 21, 1983.  During the marriage, the couple accumulated extensive assets and business interests.  The couple separated on or about December 1, 2006, and Edra filed a Petition for Dissolution on December 15, 2006 in the Superior Court of California, Riverside County.

As part of the dissolution proceedings, Blixseth and Edra entered into two Stipulations for Partial Division of Property and a Marital Settlement Agreement (collectively the "MSA").  The stipulations, dated August 21, 2007 and September 20, 2007, divided some property between Edra and Blixseth, and provided for payment of certain liabilities and operational expenses.  The settlement agreement, dated June 26, 2008 and subsequently amended July 2, 2008 and August 12, 2008, divided the remaining assets and liabilities and confirmed the division of property set out in the stipulations.

Under the terms of the MSA, Edra received Blixseth's interests in several businesses,

---

[1]   Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  All "Civil Rule" references are to the Federal Rules of Civil Procedure.

including Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC (which are collectively referred to by this Court as the "Yellowstone Club entities"), Big Springs Realty, LLC, Sunrise Ridge at Yellowstone Club, LLC, Yellowstone Club World, LLC, Blixseth Family Investments, LLC, BLXware, LLC, OpSpring, LLC and BLX Group, Inc. f/k/a Blixseth Group, Inc.  She also received assets including the Porcupine Creek residence, Chateau de Farcheville, Casa Captiva, and the Family Compound at the Yellowstone Club.  Additionally, Edra assumed liabilities including those associated with the LeMond litigation, a $4,944,396.17 cash payment to Blixseth, and Blixseth's $13,094,973.33 obligation to CIP Yellowstone Lending, LLC ("CIP").  In order to pay those liabilities, Edra borrowed $35 million from CIP.

The MSA also included provisions requiring the document's waiver and release provisions to be approved by the California Superior Court, or the entire agreement would become "null and void" by its own terms.  The California Superior Court held a hearing regarding the waiver and release provisions on July 3, 2008, during which the Blixseths each admitted they were familiar with the terms of the waivers and releases, had discussed them with counsel, and were voluntarily entering them.  The California Superior Court then entered its Order Approving Waivers and Releases later that day.  The Order Approving Waivers and Releases did not make any independent determination regarding the equity or fairness of the MSA, but did recognize that the "overall division of assets is essentially a fair division of assets *in the mind of each of the parties*." (emphasis added).

The California Superior Court entered its Judgment of Dissolution on October 7, 2008. In that order, the California Superior Court retained jurisdiction "as provided for in the MSA in

3

accordance with the terms and provisions of the MSA," and recognized that the parties had adopted the MSA without filing it with the court.

On November 10, 2008, little more than a month after the final judgment of dissolution was entered, the four Yellowstone Club entities filed bankruptcy cases. Related entities Big Springs Realty, LLC and Yellowstone Club World, LLC subsequently filed bankruptcy cases. On March 25, 2009, Edra filed her individual bankruptcy case. Petitioning creditors of BLX Group, Inc. f/k/a Blixseth Group, Inc. placed it in involuntary bankruptcy on September 24, 2009.

Trustee filed this Adversary Proceeding against Blixseth to set aside the MSA, for breach of fiduciary duty, for constructive trust under California law, for equitable subordination and to avoid and recover fraudulent transfers and preferential transfers under title 11 of the U.S. Code and relevant California law. Trustee alleges, among other things, that Edra was mistaken about the value of many of the properties she received, including the Chateau de Farcheville, Casa Captiva, Porcuipine Creek and the Family Compound at the Yellowstone Club. Trustee also alleges Blixseth failed to disclose information about community cash flow, misled Edra about the liabilities and the financial state of businesses she assumed, and interfered with Edra's business relationships to prevent her from obtaining financing. Finally, Trustee alleges Blixseth insulated assets from creditors by personally transferring "virtually all of his assets to Desert Ranch for less than reasonably equivalent value."

Blixseth seeks dismissal of this adversary proceeding for lack of subject matter jurisdiction under Civil Rule 12(b)(1), and for failure to state a claim upon which relief can be granted under Civil Rule 12(b)(6), both made applicable in this adversary proceeding by Rule

4

7012(b).  More to the point, Blixseth argues that the instant action is "barred on its face by the *Rooker-Feldman* doctrine, the California Superior Court's continuing jurisdiction over the terms of the marital settlement agreement, res judicata, collateral estoppel, estoppel by contract, mutual releases and *in pari delicto*."  Alternatively, Blixseth seeks mandatory or permissive abstention on Counts I, V and VII of the Complaint pending a decision by the California Superior Court.

APPLICABLE LAW and DISCUSSION

## I.      Subject Matter Jurisdiction and Core/Non-Core Proceedings

When considering a motion to dismiss for lack of subject matter jurisdiction, the plaintiff, as the party seeking to invoke the court's jurisdiction, always bears the burden of establishing subject matter jurisdiction.  *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008).  The court presumes a lack of subject matter jurisdiction until the plaintiff proves otherwise.  *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Trustee asserts this Court has subject matter jurisdiction under 28 U.S.C. §§ 157, 1334, and 1367.   Trustee asserts this adversary proceeding is a core bankruptcy proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(A), (B), (C), (F), (H), and (O).

Federal district courts have original and exclusive jurisdiction over all cases under title 11, and original but not exclusive jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b).  Federal district courts may refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11" to bankruptcy courts.  28 U.S.C. § 157(a).  The United States District Court for the District of Montana has made such a reference by Standing

5

Order 12 (Revised), dated December 9, 2009. Bankruptcy courts may hear and render final judgments in core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C. § 157(b)(1). Bankruptcy courts may issue findings of fact and conclusions of law in non-core proceedings, 28 U.S.C. § 157(c)(1) and Rule 9033, and may even issue final judgments in non-core proceedings if all parties consent, 28 U.S.C. § 157(c)(2). Since bankruptcy courts may only issue final judgments in non-core proceedings if the parties consent, Rules 7008(a) and 7012(b) require complaints, counterclaims, cross-claims, third-party complaints and responsive pleadings to include a statement of whether the proceeding is core or non-core. If the proceeding is non-core, parties must also include a statement indicating whether they consent to the bankruptcy court entering final orders. Fed.R.Bankr.P. 7008(a), 7012(b).

Congress specifically enacted 28 U.S.C. § 157 in response to the U. S. Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). In *Northern Pipeline*, the Supreme Court held, in a plurality opinion, that a bankruptcy court did not have jurisdiction to hear a prepetition breach of contract claim that the debtor-in-possession had brought. The *Northern Pipeline* holding was based primarily on the premise that granting the bankruptcy court such jurisdiction allowed a non-Article III court to adjudicate claims based on state-created private rights arising independent from and antecedent to the bankruptcy proceedings, and involving individuals that would not otherwise be parties to the bankruptcy proceeding. *See Northern Pipeline*, 458 U.S. at 84. Congress subsequently established 28 U.S.C. § 157 to remedy the defects in the bankruptcy system noted in *Northern Pipeline*.

Subsequent to *Northern Pipeline* and enactment of § 157, the Ninth Circuit in *Security Farms v. International Brotherhood of Teamsters*, 124 F.3d 999, 1008 (9th Cir. 1997) (citing

*Piombo Corp. v. Castlerock Props. (In re Castlerock Properties)*, 781 F.2d 159, 162 (9th Cir. 1986)), explained that "[a]ctions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered 'non-core'."  Other Ninth Circuit authority notes that core proceedings are matters concerning administration of the estate and rights created by title 11.  *Robertson v. Isomedix, Inc. (In re International Nutronics, Inc.)*, 28 F.3d 965, 969 (9th Cir. 1994), *cert. denied Robertson v. Isomedix, Inc.*, 513 U.S. 1016 (1994).  Similarly, the Ninth Circuit Bankruptcy Appellate Panel has held:  "'If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding . . . .'"  *Bethlahmy, IRA v. Kuhlman (In re ACI-HDT Supply Co.)*, 205 B.R. 231, 237 (9th Cir. BAP 1997) (quoting *Eastport Assocs. v. Los Angeles (In re Eastport Assocs.)*, 935 F.2d 1071, 1076 (9th Cir. 1987)).

The Ninth Circuit discussed factors to be considered in determining whether a proceeding is core or non-core in *Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 617 (9th Cir. 1993):

> If a claim is not listed explicitly in § 157(b)(2) as a "core proceeding[ ]," we "consider[ ] factors such as whether the rights involved exist independent of title 11, depend on state law for their resolution, existed prior to the filing of a bankruptcy petition, or were significantly affected by the filing of the bankruptcy case."  *Taxel v. Electronic Sports Research (In re Cinematronics, Inc.)*, 916 F.2d 1444, 1450 n. 5 (9th Cir. 1990).  Determinations regarding the nature and extent of the bankruptcy estate are fundamental functions of the bankruptcy court and would be "core proceedings."  *John Hancock Mutual Life Ins. Co. v. Watson (In re Kincaid)*, 917 F.2d 1162, 1165 (9th Cir. 1990).

If an action is not core, this Court may also have jurisdiction over matters that are related to a bankruptcy case.  As succinctly explained in *Pacor, Inc., v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), "an action is related to bankruptcy if the outcome could alter the debtor's rights,

7

liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate."

The claims for equitable subordination and to avoid and recover fraudulent transfers and preferential transfers are statutorily-defined core proceedings enumerated in 28 U.S.C. § 157(b)(2)(B), (F), and (H), and involve substantive rights created under bankruptcy law.[2]   The claims to set aside the MSA, for breach of fiduciary duty and for constructive trust fall under this Court's jurisdiction as claims related to a bankruptcy case.  Although those claims exist independently outside of bankruptcy and rely on state law for their resolution, they could bring significant assets back into the bankruptcy estate, and could therefore "alter the debtor's rights, liabilities, options or freedom of action" in such a way as to "impact upon the handling and administration of the bankruptcy estate" in satisfaction of the *Pacor* test.  Under Rule 7012(a), the filing of a motion to dismiss under Civil Rule 12(b) tolls the time to answer the complaint in an adversary proceeding, so Blixseth has not yet indicated whether he consents to have a final order or judgment issued by this Court, as required under 28 U.S.C. § 157(c)(2) and Rule 7008. The parties' consent or lack thereof will determine this Court's treatment of the non-core claims. 28 U.S.C. § 157(c)(2).

## II.     The *Rooker-Feldman* Doctrine

Blixseth argues this Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine. The Ninth Circuit discussed the *Rooker-Feldman* doctrine at length recently in

---

[2]  This Court notes that under *Granfinanciera v. Nordberg*, 492 U.S. 33, 56 (1989), a distinction should be drawn between fraudulent transfer claims and claims for equitable subordination or preferential transfer.  That distinction and its relevance to the constitutionality of bankruptcy courts' jurisdiction over such claims is discussed further in Section VII of this Memorandum, at 20-21.

*Carmona v. Carmona*, 603 F.3d 1041, 1050 (9th Cir. 2010):

> The *Rooker-Feldman* doctrine takes its name from two Supreme Court cases:  *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).  It stands for the relatively straightforward principle that federal district courts do not have jurisdiction to hear de facto appeals from state court judgments. [*Noel v. Hall*, 341 F.3d 1148, 1155 (9th Cir. 2003)]. The jurisdiction prohibition arises from a negative inference drawn from 28 U.S.C. § 1257 which grants jurisdiction to review state court decisions in the United States Supreme Court.  *Kougasian v. TMSI, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004) (citation omitted).  Because it grants jurisdiction to the Supreme Court, section 1257 impliedly prohibits lower federal courts from reviewing state court decisions.  *Id.*

> Stated simply, the *Rooker-Feldman* doctrine bars suits "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indust. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1516, 161 L.Ed.2d 454 (2005).  In practice, the *Rooker-Feldman* doctrine is a fairly narrow preclusion doctrine, separate and distinct from res judicata and collateral estoppel.  *See Noel*, 341 F.3d at 1162-64.

> We have previously explained how federal courts should distinguish a forbidden de facto appeal of a state court decision that is barred by *Rooker-Feldman* from a suit that is barred by other preclusion principles.  A suit brought in federal district court is a "de facto appeal" forbidden by *Rooker-Feldman* when "a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision."  *Id.* at 1164.  In contrast, if a plaintiff "asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction."  *Id.*

In 2006, the Supreme Court repeated: "*Rooker-Feldman* is not simply preclusion by another name.  The doctrine applies only in 'limited circumstances,' *Exxon Mobil*, *supra*, at 291, 125 S.Ct. 1516, where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court."  *Lance v. Dennis*, 546 U.S. 459, 466 (2006).  More recently, the United States Supreme Court echoed the foregoing:

> [W]e clarified in *Exxon* that *Rooker–Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers ...

inviting district court review and rejection of [the state court's] judgments." *Ibid*.

Skinner's litigation, in light of *Exxon*, encounters no *Rooker–Feldman* shoal. "If a federal plaintiff 'present[s][an] independent claim,'" it is not an impediment to the exercise of federal jurisdiction that the "same or a related question" was earlier aired between the parties in state court. *id.*, at 292–293, 125 S.Ct. 1517 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (C.A.7 1993); first alteration in original); *see In re Smith,* 349 Fed.Appx. 12, 18 (C.A.6 2009) (Sutton, J., concurring in part and dissenting in part) (a defendant's federal challenge to the adequacy of state-law procedures for postconviction DNA testing is not within the "limited grasp" of *Rooker–Feldman*).

*Skinner v. Switzer*, 131 S.Ct. 1289, 1297 (March 7, 2011).

Earlier the Ninth Circuit explained the *Rooker-Feldman* doctrine as follows:

In its routine application, the *Rooker-Feldman* doctrine is exceedingly easy. A party disappointed by a decision of a state court may seek reversal of that decision by appealing to a higher state court. A party disappointed by a decision of the highest state court in which a decision may be had may seek reversal of that decision by appealing to the United States Supreme Court. In neither case may the disappointed party appeal to a federal district court, even if a federal question is present or if there is a diversity of citizenship between the parties. *Rooker-Feldman* becomes difficult – and, in practical reality, only comes into play as a contested issue – when a disappointed party seeks to take not a formal direct appeal, but rather its de facto equivalent, to a federal district court.

*Noel*, 341 F.3d at 1155.

The Ninth Circuit explained that the *Rooker-Feldman* doctrine is a statute-based

doctrine based on negative inferences of relevant statutes, the modern day successors to

which are 28 U.S.C. §§ 1331, 1332, and 28 U.S.C. § 1257. *Id.* at 1154-55. However:

Under the modern statutory structure, the principle that there should be no appellate review of state court judgments by federal trial courts has two particularly notable statutory exceptions: First, a federal district court has original jurisdiction to entertain petitions for habeas corpus brought by state prisoners who claim that the state court has made an error of federal law. 28 U.S.C. § 2254. Second, a federal bankruptcy court has original jurisdiction under which it is "empowered to avoid state judgments, *see, e.g.*, 11 U.S.C. §§ 544, 547, 548, 549; to modify them, *see, e.g.*, 11 U.S.C. §§ 1129, 1325; and to discharge them, *see, e.g.*, 11 U.S.C. §§ 727, 1141, 1328." [*In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir.

10

2000) (en banc)].

*Id.* at 1155.  In this case, the second exception applies to the claims of fraudulent and preferential transfers, preventing application of the *Rooker-Feldman* doctrine to those claims.

In the context of examining issues related to a divorce, the *Rooker-Feldman* doctrine bars only issues that were considered in the state court dissolution.  Federal courts lack jurisdiction to hear independent claims of breach of fiduciary duty, conversion, and fraud when those issues were heard in the state court dissolution and contributed to the state court's property division. *Kahn v. Kahn,* 21 F.3d 859, 861-62 (8th Cir. 1994) (holding the court lacked jurisdiction to hear the claim under the domestic relations exception, using reasoning applicable under the *Rooker-Feldman* doctrine).  However, when a state court merely adopts a marital property settlement without adjudicating the property division, subsequent claims alleging misconduct by the former spouse in obtaining that settlement are not barred by *Rooker-Feldman* because the plaintiff is alleging misconduct by the spouse rather than error by the state court.  *Strasen v. Strasen*, 897 F.Supp. 1179, 1183 (E.D.Wis., 1995).

In the case *sub judice*, Trustee is not seeking a de facto appeal of the California Superior Court dissolution decree, but instead asserts a separate, previously unlitigated claim for relief to rescind the MSA based on mistake and misrepresentation.  Trustee alleges claims of mistake and misrepresentation that were not considered by the California Superior Court.  Further, the Superior Court merely confirmed that the marital property would be divided pursuant to the MSA without ever making independent findings

11

regarding that division.  Trustee's claims cannot be considered an impermissible review of the state court judgment, and are therefore not barred by the *Rooker-Feldman* doctrine.

The *Rooker-Feldman* doctrine also bars federal court jurisdiction over claims "inextricably intertwined" with a state court judgment, and a claim is inextricably intertwined "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it."  *Fontana Empire Ctr., LLC v. Fontana*, 307 F.3d 987, 992 (9th Cir. 2004).  However, "'inextricably intertwined' has a narrow and specialized meaning in the *Rooker-Feldman* doctrine," and applies only to claims that are closely related to claims that are already barred under the *Rooker-Feldman* doctrine as de facto state court appeals.  *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1142 (9th Cir. 2004).  Since none of the claims are barred by the *Rooker-Feldman* doctrine, none of the claims are barred as inextricably intertwined claims.

### III.    The Domestic Relations Exception

To the extent *Rooker-Feldman* does not bar jurisdiction, an additional exception to federal jurisdiction known as the "domestic relations" exception exists, which this Court examines *sua sponte* because the underlying dispute arises from the Blixseths' divorce. The domestic relations exception covers "only a narrow range of domestic relations issues."  *Marshall v. Marshall*, 547 U.S. 293, 307 (2006) (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 701 (1992)).  The Supreme Court clarified that "only 'divorce, alimony, and child custody decrees' remain outside federal jurisdictional bounds.  While recognizing the 'special proficiency developed by state tribunals . . . in handling issues that arise in the granting of [divorce, alimony, and child custody] decrees,' we viewed federal courts as

equally equipped to deal with complaints alleging the commission of torts." *Marshall*, 547 U.S. at 308, (citations omitted) (explaining *Ankenbrandt*).

However, the Ninth Circuit explained that the domestic relations exception applies only in cases heard under diversity jurisdiction:

> *Ankenbrandt* held that the domestic relations exception was not of constitutional dimension, but rested on Congress' intent in enacting the diversity jurisdiction statute, 28 U.S.C. § 1332. Although *Ankenbrandt* did not address whether the exception applies to the federal question jurisdiction statute, 28 U.S.C. § 1331, the Court's reasoning plainly does not apply to that statute. . . . [W]e clarify today that the domestic relations exception applies only to the diversity jurisdiction statute.

*Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 947 (9th Cir. 2008).

In the case *sub judice*, this Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 as explained above. Although diversity jurisdiction may exist in this case, it is not the sole ground for subject matter jurisdiction for any of the claims. Therefore, the domestic relations exception does not apply.

### IV.    Failure to State a Claim Upon Which Relief Can Be Granted

Blixseth next argues that Counts I - VII of the Trustee's Complaint fail to state claims upon which relief can be granted. In addressing a Civil Rule 12(b)(6) challenge, a court accepts all nonconclusory factual allegations in the complaint as true, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007); *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.Ct. 1937, 1949-50 (2009), and construes the pleading in the light most favorable to the nonmoving party, *Tanner v. Heise*, 879 F.2d 572, 576 (9th Cir. 1989). "[D]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1196 (9th Cir. 1998) (quoting *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996), *overruled*

13

*on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007)).  To

survive a motion to dismiss under Civil Rule 12(b)(6), a complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.  The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id*. (citations omitted).  Construing all nonconclusory

factual allegations as true, the Court finds that Trustee's complaint has facial plausibility.

### V.    Failure to Plead Responses to Affirmative Defenses

Throughout his Memorandum in Support of His Motion to Dismiss Adversary

Complaint, Blixseth asserts waiver, mutual releases, estoppel, ratification, laches, res

judicata, and collateral estoppel as reasons why the Complaint failed to state claims for

which relief can be granted.  Each of those doctrines qualifies as an affirmative defense.

*See* Fed.R.Civ.P. 8(c); *Marshack v. Orange Commercial Credit (In re Nat'l Lumber &*

*Supply, Inc.)*, 184 B.R. 74, 77 (9th Cir. BAP 1995) ("Affirmative defenses plead matters

extraneous to the plaintiff's prima facie case, which deny the plaintiff's right to recover

even if the allegations of the complaint are true.").

Under Civil Rule 8(c), made applicable in adversary proceedings by Rule 7008(a),

the burden for pleading affirmative defenses rests upon the defendant.  Further, federal

courts have consistently held "[c]omplaints need not anticipate, and attempt to plead

around, potential affirmative defenses."  *Davis v. Indiana State Police*, 541 F.3d 760, 763

(7th Cir. 2008) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).  However, a party can "plead itself out of court" by alleging facts in its complaint that admit the essential elements of a defense.  *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003).  Here, Trustee has not admitted the essential elements of any of the alleged affirmative defenses within the facts of the complaint, and has not therefore pled itself out of this Court.  Nor did Trustee have any burden to anticipate and respond to Blixseth's affirmative defenses.  This Court will not further consider these affirmative defenses as part of this motion, and will review their merits when they have been appropriately pled and submitted.

### VI.    Motion for Mandatory Abstention or Permissive Abstention

Blixseth alternatively seeks mandatory or permissive abstention on Counts I, V and VII of the Complaint pending a decision by the California Superior Court.

Discretionary abstention is governed by 28 U.S.C. § 1334(c)(1), and applies to proceedings arising under title 11, arising in a case under title 11, or relating to a case under title 11:  "Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."  *Krasnoff v. Marshack (In re General Carriers Corp.),* 258 B.R. 181, 189-190 (9th Cir. BAP 2001) (quoting 28 U.S.C. § 1334(c)(1)).  Mandatory abstention is governed by 28 U.S.C. § 1334(c)(2), and applies only to "related to" proceedings.  *Sec. Farms*, 124 F.3d at 1009.  "[A]bstention provisions implicate the question whether the bankruptcy court

15

should exercise jurisdiction, not whether the court has jurisdiction in the first instance.... The

act of abstaining presumes that proper jurisdiction otherwise exists." *In re General Carriers*

*Corp.,* 258 B.R. at 190, quoting *S.G. Phillips Constructors, Inc. v. Burlington* (*In re S.G.*

*Phillips Constructors, Inc.)*, 45 F.3d 702, 708 (2nd Cir.1995); *In re Lewis*, 20 Mont. B.R.

364, 368 (Bankr. D. Mont. 2003).

In *Lewis*, this Court cited controlling authority for the following proposition on

abstention:

> In *Security Farms v. International Brotherhood of Teamsters*, 124 F.3d 999 (9th
> Cir.1997), however, the Ninth Circuit noted that "[a]bstention can exist only
> where there is a parallel proceeding in state court." *Id.* at 1009.  Section §1334(c)
> abstention should be read *in pari materia* with 28 U.S.C. § 1452(b) remand, so
> that § 1334(c) applies only in those cases in which there is a related proceeding
> that either permits abstention in the interest of comity, section 1334(c)(1), or that,
> by legislative mandate, requires it, section 1334(c)(2).  *Id.* at 1010; *In re Lazar*,
> 237 F.3d 967, 981 (9th Cir. 2001).  A decision to abstain or not to abstain is not
> reviewable by appeal. § 1334(d); *see also, Security Farms*, 124 F.3d at 1009-10 &
> n. 7; *In re Lazar*, 237 F.3d at 982.

*Lewis*, 20 Mont. B.R. at 369.  As discussed in *Lewis*, abstention under either 28 U.S.C.

§ 1334(c)(1) or 28 U.S.C. § 1334(c)(2) is inapplicable when no parallel state court

proceeding is pending.  *Schulman v. California (In re Lazar)*, 237 F.3d 967, 981-82 (9th Cir.

2001); *see also Sec. Farms*, 124 F.3d at 1009-10 (abstention exists only were there is a

parallel proceeding in state court).

In the context of a motion for abstention in bankruptcy, a parallel proceeding

requires "that the state proceeding involve the same issues as the federal proceeding."

*Smith v. McLesky (In re Bay Vista of Va., Inc.),* 394 B.R. 820, 843 (Bankr. E.D. Va. 2008).

 Further, a parallel proceeding fails to trigger abstention provisions unless it is ongoing.  *See*

*Winnecour v. Taylor (In re Taylor)*, 444 B.R. 534, 536 (Bankr. W.D. Pa 2011) (holding

mandatory abstention did not apply because a state court proceeding had nothing left to adjudicate when the only recent activity in the proceeding was the return of unexecuted writs).

Blixseth does not allege a pending, parallel state court proceeding, merely stating: "The dissolution proceeding was commenced in the California Superior Court and that Court specifically retained jurisdiction to adjudicate disputes arising out of the MSA." The California Superior Court accepted the waivers and releases within the MSA, and recognized the Blixseths executed the MSA without filing it with the court.  Neither party alleges that the California Superior Court heard any claims to rescind the MSA due to mistake or misrepresentation, for breach of fiduciary duty, or for constructive trust.  Further, the California Superior Court entered its Judgment of Dissolution on October 7, 2008 and Blixseth does not allege any more recent activity in that proceeding, so the state court proceeding is no longer ongoing. Finally, Blixseth does not assert, nor could this Court find, any binding or persuasive authority stating a state court's retention of jurisdiction would qualify as a pending, parallel state court proceeding for the purposes of abstention under 28 U.S.C. § 1334(c).  Accordingly, the request for abstention is denied.

**VII.    Constitutionality of Core Jurisdiction Under *Stern v. Marshall***

Finally, this Court considers *sua sponte* the impact of new, intervening case law on the constitutionality of this Court's subject matter jurisdiction.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.")  This Court has left this matter

17

as a question of last resort, since "a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011) (citing *Lyng v. Nw. Indian Cemetery Protective Assn.*, 485 U.S. 439, 445 (1988)).  Since this motion cannot be disposed on other grounds, this Court must consider this constitutional question.

Although this Court has core jurisdiction over the equitable subordination and fraudulent and preferential transfer claims pursuant to its statutory authority, that authority may not be exercised unless it is also constitutional.  *Stern v. Marshall*, 131 S.Ct. 2594 (2011).  In *Stern v. Marshall*, the U.S. Supreme Court recognized that the bankruptcy court had statutory authority to render a final judgment on the debtor's compulsory counterclaim because it was a core proceeding under the bankruptcy code, *id.* at 2604-05, but held the exercise of that authority an unconstitutional usurpation of the judiciary's power under Article III, *id*. at 2620 ("Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984.")

The U.S. Constitution's system of separation of powers prohibits Congress from removing cases from the judiciary that are "the subject of a suit at the common law, or in equity, or admiralty."  *Id.* at 2609 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)).  "When a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit

18

rests with Article III judges in Article III Courts." *Id.* (citations omitted) (quoting *Northern Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in judgment)).

Bankruptcy courts may not hear claims reserved to Article III courts because they are not Article III courts, or adjuncts of Article III courts when hearing core proceedings. Bankruptcy judges hold their offices without the Article III, Section 1 protections of lifetime appointments and salaries that may not be diminished by Congress.  28 U.S.C. § 152(a)(1).  See also *Northern Pipeline*, 458 U.S. at 61.  Since non-Article III courts do not offer those assurances of an independent judiciary, they do not offer the same protections for both the Judicial Branch and the individual, *Stern*, 131 S.Ct. at 2609, and cannot hear all of the same claims an Article III federal court may hear.  Additionally, bankruptcy courts, in exercising jurisdiction over core proceedings, do not act as adjuncts of Article III courts.  Bankruptcy courts adjudicating core proceedings have broad authority to hear "all matters of fact and law in whatever domains of the law," and can enter final judgments, meaning they are not merely acting as adjuncts to the district courts.  *Id.* at 2618-19; *see also Northern Pipeline*, 458 U.S. at 85-86 ("[T]he bankruptcy courts issue final judgments, which are binding and enforceable, even in the absence of an appeal.  In short, the 'adjunct' bankruptcy courts created by the [1978] Act exercise jurisdiction behind the facade of a grant to the district courts.") Since the bankruptcy courts are neither Article III courts nor adjuncts thereof, they generally may not hear claims that must be adjudicated by Article III courts.

In order for Congress to allow a non-Article III court, like a bankruptcy court, to adjudicate claims that must normally be heard by an Article III court, the claim must fall

19

within one of the recognized exceptions to Article III.  Such exceptions arise where "the grant of power to the Legislative and Executive Branches was historically and constitutionally so exceptional that the congressional assertion of a power to create legislative courts was consistent with, rather than threatening to, the constitutional mandate of separation of powers." *Northern Pipeline*, 458 U.S. at 64 (plurality opinion). Previously recognized exceptions include territorial courts, courts martial, and the "public rights" exception. *Id.* at 64-67.  The cases within the public rights exception historically involved disputes "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Stern*, 131 S.Ct. at 2612 (citing *Crowell v. Benson*, 285 U.S. 22, 50-51 (1932)), but has more recently evolved to include cases  involving rights "integrally related to particular federal government action," *Stern*, 131 S.Ct. at 2613 (citing *U.S. v. Jicarilla Apache Nation*, 131 S.Ct. 2313 (2011)).

Fraudulent conveyance claims in bankruptcy do not fall within the public rights exception.  Although codified by the Bankruptcy Reform Act of 1978, fraudulent conveyance claims are  "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Granfinanciera*, 492 U.S. at 56. That reasoning was reaffirmed by *Stern* as the Court rejected the contention that the debtor's compulsory counterclaim fell under the public rights exception:

> *Granfinanciera*'s distinction between actions that seek "to augment the
> bankruptcy estate" and those that seek "a pro rata share of the bankruptcy res,"

20

reaffirms that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.

*Stern*, 131 S.Ct. at 2618 (emphasis in the original). Such language implies that bankruptcy actions tied to the claims allowance process would fall within the public rights exception as integrally related to federal administration of bankruptcy, while actions to augment the estate would not. Since Trustee's fraudulent conveyance claim is essentially a common law claim attempting to augment the estate, does not stem from the bankruptcy itself and would not be resolved in the claims allowance process, it is a private right that must be adjudicated by an Article III court. This Court's jurisdiction over that claim as a core proceeding is therefore unconstitutional. However, the equitable subordination and preferential transfer claims arise from the Bankruptcy Code and the claims allowance process, therefore, this Court's jurisdiction over those claims is constitutionally acceptable.

Unlike in non-core proceedings, a bankruptcy court has no statutory authority to render findings of fact and conclusions of law for core proceedings that it may not constitutionally hear. While 28 U.S.C. § 157(c)(1) allows a bankruptcy judge to render findings and conclusions in "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11," no other code provision allows bankruptcy judges to do the same in core proceedings. Similarly, no provision allows parties to consent to a bankruptcy court making final decisions in core proceedings as 28 U.S.C. § 157(c)(2) allows parties to consent for non-core proceedings. The code provides only that "Bankruptcy judges may hear and determine all cases under title 11 and all core

21

proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1).  Since this Court may not constitutionally hear the fraudulent conveyance claim as a core proceeding, and this Court does not have statutory authority to hear it as a non-core proceeding, it may in no case hear the claim. Therefore, this Court grants the parties fourteen days in which to move the District Court to withdraw its reference, in whole or in part, pursuant to 28 U.S.C. § 157(e), or else it will dismiss the fraudulent conveyance claims for lack of subject matter jurisdiction.

For the reasons discussed above, the Court will enter a separate order providing as follows:

IT IS ORDERED Defendant Timothy Blixseth's Motion for Mandatory Abstention or Permissive Abstention, filed November 11, 2010 at docket entry no. 9, is denied.

IT IS FURTHER ORDERED that Defendant Timothy Blixseth's Motion to Dismiss Adversary Complaint Pursuant to Fed.R.Bankr.P. 7012(b), filed November 12, 2010 at docket entry no. 12, is denied for the following claims: Count I (to set aside the MSA), Count IV (preferential transfer), Count V (breach of fiduciary duty), Count VII (constructive trust), and Count VIII (equitable subordination).

IT IS FURTHER ORDERED that the parties have until August 15, 2011 to file a motion with the U.S. District Court requesting it withdraw its reference to the Bankruptcy Court of all or part of this Adversary Proceeding.  If such motion is not made, Defendant Timothy Blixseth's Motion to Dismiss Adversary Complaint Pursuant to Fed.R.Bankr.P.

22

7012(b), filed November 12, 2010 at docket entry no. 12, shall be granted for Counts II,

III, and VI (the fraudulent conveyance claims).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

23